STATE SECURITY INSURANCE COMPANY, Plaintiff-Appellant, v. RAMON SOTOS BURGOS *et al.*, Indiv. and d/b/a Casablanca Liquor and Grocery Store, *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—89—2101

Opinion filed July 18, 1990.—Rehearing denied December 7, 1990.

Brody, Gore, Fineberg & Wikoff, Ltd., of Chicago (Larry R. Wikoff and Marcus J. Nunes, of counsel), for appellant.

Leonard M. Ring & Associates, of Chicago (Leonard M. Ring and William J. Jovan, of counsel), for appellees.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, State Security Insurance Company, filed a declaratory judgment action against Ramon and Felicita Sotos Burgos, individually and d/b/a Casablanca Liquor and Grocery Store, their son, Rolando Soto, and Milagros C. Segarra, administrator of the estate of Manuel A. Segarra. Plaintiff sought a declaration that it did not owe the Burgoses or Soto a duty to defend or indemnify them under a liability insurance policy, issued to the Burgoses, in a lawsuit brought by Milagros Segarra as administrator of the estate of Manuel Segarra. After plaintiff and Segarra filed cross-motions for summary judgment, the trial court denied plaintiff's motion and granted Segarra's motion. Plaintiff appeals the denial of its motion for summary judgment and the grant of Segarra's motion. Only Segarra (hereinafter defendant) has filed an appellee's brief.

The action underlying plaintiff's declaratory action grew out of the death of Manual Segarra, after being shot by Rolando Soto on November 5, 1981. In its declaratory judgment complaint, plaintiff alleged that the Burgoses had failed to comply with the "notice of occurrence" provision of the policy issued by plaintiff.[1] That provision

---

[1] The policy defined "occurrence" as "an accident, including injurious exposure to conditions which results during the policy period in bodily injury or property damage neither expected or intended from the standpoint of the insured."

stated that "[i]n the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof and the names and addresses of the injured and of available witnesses shall be given by or for the insured to the company or any of its authorized agents as soon as practicable." Plaintiff alleged that it had not received notice of Segarra's shooting and death until November 28, 1983, when it received a copy of the summons and complaint in defendant Segarra's law action against the Burgoses. After receiving notice of the suit, plaintiff undertook to represent the Burgoses and Soto under a reservation of rights.

After answering the complaint, defendant moved for summary judgment on the grounds that: (1) notice to plaintiff of Segarra's shooting was excused because the Burgoses reasonably believed that they were not liable therefor as it had occurred outside of the store; (2) the Burgoses had acted reasonably in giving notice of the shooting to their insurance broker, Robert Patis, who procured plaintiff's insurance coverage for the Burgoses, and whom plaintiff had clothed with apparent authority to receive notice as required under the policy; and (3) given the definitions in plaintiff's policy of the terms "occurrence" and "bodily injury," as used therein, no notice of the shooting death of Segarra was required thereunder. The trial court entered summary judgment for defendant, agreeing with her second ground therefor.

Preliminarily, we must address plaintiff's motions to strike as irrelevant and/or incompetent those portions of the statement of fact in defendant's brief dealing with: (1) the prior claims history between Patis and the Burgoses; (2) what Patis told Burgos after the shooting of Segarra; (3) the occurrence underlying defendant's claim; (4) the underlying procedural aspects of this case; and (5) the customs and practices in the insurance industry.

We will grant plaintiff's motion to strike defendant's references to the prior claims history between Patis and the Burgoses in view of the lack of any evidence that plaintiff had issued any policies other than the one at issue to the Burgoses. However, we deny the motion to strike her references as to what Patis told Burgos, after the shooting of Segarra, regarding whether the Burgoses' insurance would cover the incident. We also deny the motion to strike to the extent that plaintiff may be seeking to exclude: (a) Burgos' testimony that he believed that if he reported the incident to Patis, he did not have to report it to anyone else; and (b) the testimony of Burgos and Patis that Patis told Burgos not to worry after Burgos

reported the shooting to him. Contrary to plaintiff's assertions, we believe that what Patis told Burgos after Segarra's shooting and Burgos' belief as to his duties with respect to giving plaintiff notice of the shooting, as affected thereby, are absolutely relevant to the issue before us. We also grant the motion to strike defendant's references to the specific facts of the occurrence underlying defendant's claim and the underlying procedural aspects of this case. However, we deny the latter motion to the extent that plaintiff may be seeking to strike defendant's reference to plaintiff's reservation of rights and to plaintiff's argument below that the matter of prejudice to it in this case is irrelevant. The fact that plaintiff reserved its rights against the Burgoses cannot be ignored since it was the predicate for plaintiff's request for declaratory relief. Moreover, it is illogical for plaintiff to attempt to bar defendant from relying on plaintiff's position below regarding the matter of prejudice to it in view of the fact that plaintiff takes the same position on appeal as well.

The most problematical matter we must address is whether defendant should be barred from relying upon the testimony of Patis and plaintiff's claims manager, Michael Fitzgerald, regarding the customs and practice of plaintiff specifically and the insurance industry generally. To the extent that plaintiff relies on defendant's alleged mischaracterization and/or misstatement of that testimony, we will grant the motion to strike. However, we must note that we may nonetheless read that testimony for ourselves and come to our own conclusions as to its meaning. To the extent that plaintiff relies upon the alleged incompetence of Patis and Fitzgerald to testify to plaintiff's and industry-wide customs and practices, we will deny the motion. All that need be shown to testify to a party's or industry's customs and practices is a sufficient familiarity therewith. (See *Capital Development Board ex rel. P.J. Gallas Electrical Contractors, Inc. v. G.A. Rafel & Co.* (1986), 143 Ill. App. 3d 553, 493 N.E.2d 348.) The record conclusively reveals that Patis and Fitzgerald satisfied that requirement.

Finally, Fitzgerald's testimony is not objectionable for the additional reasons advanced by plaintiff that his testimony was based on speculation and on his employment at a "completely different" insurance agency or because his testimony regarding plaintiff's receipt of notices from brokers concerned only notices of claims, not notices of occurrences. In the one instance in which Fitzgerald characterized his testimony as speculative, we find that he had a sufficient familiarity with the practices of plaintiff and brokers with

whom it dealt to construe that testimony as opinion based on that familiarity rather than pure speculation. As to Fitzgerald's employment with a "completely different" insurance agency, plaintiff ignores his testimony that that agency had an agency relationship with plaintiff and that he worked there for three years prior to working for plaintiff. In view of those facts, the fact that Fitzgerald based his testimony, in part, on his employment with that agency provides no basis on which to object thereto. Finally, the record clearly controverts plaintiff's assertion that Fitzgerald did not testify that plaintiff received notices of occurrences from brokers, among others.

On appeal, plaintiff contends that the Burgoses failed to give notice of the shooting death of Segarra to plaintiff as soon as practicable. Specifically, plaintiff argues that the Burgoses giving notice to their insurance broker, Patis, did not constitute notice to it because he was the Burgoses' agent, not plaintiff's. With respect to the trial court's finding that Patis had apparent authority to receive notice on plaintiff's behalf, plaintiff argues that it neither took any actions nor acquiesced in any actions by Patis with regard to his authority to act as its agent. It further argues that defendant failed to establish that the Burgoses relied on Patis' apparent authority in that regard.

Addressing the specific facts of this case, plaintiff argues that Patis never advised it that he routinely obliterated the information contained on the face of the policy as to plaintiff's representative, Guild Insurance Agency, by placing a sticker with his own name and address thereover. Nor did it know, plaintiff asserts, that Patis would attach his own cover letter to the policies delivered to him for delivery to plaintiff's insureds advising them to notify him in the event of a loss.

■ In support, by way of distinction, plaintiff cites *Empire Fire & Marine Insurance Co. v. Faith Truck Lines, Inc.* (1988), 178 Ill. App. 3d 356, 533 N.E.2d 441. In *Empire*, the court found that the prior course of conduct of an insurer, its agent, the insured's agent and the insured with respect to the reporting of accidents had created an apparent agency on behalf of the insurer for receipt of notice of loss in the insured's agent and that the insurer was estopped to deny that apparent agency as well as the apparent agency of its own agent. In this case, unlike *Empire*, plaintiff notes, there was no prior course of dealings between it and the Burgoses that could mislead them into believing that their agent, Patis, had an agency relationship with plaintiff. For that reason,

plaintiff, unlike the insurer in *Empire*, could not have acquiesced to Patis' actions in receiving notice of Segarra's death on its behalf.

Plaintiff also notes that *State Security Insurance Co. v. Goodman* (1972), 6 Ill. App. 3d 1008, 286 N.E.2d 374, and *Mitchell Buick & Oldsmobile Sales, Inc. v. National Dealer Services, Inc.* (1985), 138 Ill. App. 3d 574, 485 N.E.2d 1281, which defendant cited in the trial court and cites on appeal as finding an insured's broker to be the agent of the insurer for purposes of receipt of notice of a loss, restate the fundamental requirement for apparent agency that the insurer must have taken some action *vis-a-vis* the insured to be estopped to deny the authority of its apparent agent. Unlike *Goodman*, wherein the insurer specifically named the insured's broker as its authorized representative in the policy issued the insured, and unlike *Mitchell*, wherein the insurer failed to name its authorized agent in the policy issued the insured, in this case plaintiff named its authorized representative, Guild Insurance Agency, in the policy. Lastly, plaintiff argues that the Burgoses did not rely upon any actions by it in believing that they had met their obligation of notifying plaintiff of the shooting of Segarra by informing Patis of that occurrence.

In response, defendant argues that the facts of this case reveal "a course of dealing" within the insurance industry which, for the purpose of receipt of notice of an occurrence, cloaked Patis with the apparent authority to receive such notice on plaintiff's behalf. In this regard, defendant argues that the only representative of plaintiff which the Burgoses ever knew of was Patis. Further in this regard, defendant notes the deposition testimony of plaintiff's vice-president that: (1) "the regular practice" was for an insured to report an occurrence to his broker, who would then report it to an insurance company; (2) policies are delivered to an insured's agent "as a convenience"; (3) the "general procedure" is that an insured would report a claim to the individual to whom he paid his insurance premiums; and (4) plaintiff receives notices of occurrences from agents as well as brokers.

Defendant further argues that because plaintiff engages in the " 'common practice in Illinois' " of transmitting the policy to the insured through the latter's agent, that agent is afforded the opportunity to identify itself as plaintiff's authorized representative and to append a direction that all losses should be reported to him. In support, defendant cites *Goodman* and *American Home Assurance Co. v. City of Granite City* (1978), 59 Ill. App. 3d 656, 375 N.E.2d 969. Specifically, defendant argues that, similarly to *Goodman*, in this

case an insured's agent, "consistent with a 20 year relationship" between them, obtained an insurance policy and transmitted it to the insured with the direction to report any loss to him "and thereby conveyed to the insured apparent authority as an " 'authorized agent.' " Defendant further notes that there is no support in the court's opinion for plaintiff's assertion that in *Goodman* the insurer listed the insured's agent as its authorized representative. Rather, defendant asserts that the opinion merely states the appearance of the policy to the insured.

After citing language in *Mitchell* holding, *inter alia*, that the term "[a]uthorized representative" as used in the policy there at issue was ambiguous and therefore should be interpreted in favor of coverage, defendant asserts that this case presents a stronger set of facts than *Mitchell* to support a finding of apparent agency. Specifically, defendant notes the evidence that: (1) Patis was plaintiff's "conduit" to the Burgoses as its insureds; (2) Patis attached his sticker to "every policy," including defendant's, to indicate that he was plaintiff's representative; and (3) the terms of the policy were ambiguous to Burgos, especially in view of his limited education and obvious lack of knowledge of insurance matters. Thus, under *American Home*, *Goodman* or *Mitchell*, defendant concludes, notice to Patis was notice to plaintiff's authorized agent. Finally, defendant notes the holding in *Empire* that a broker can act as agent of both an insured and insurer for purposes of notice where the notice provision of the policy there at issue did not define "agent" and the insured's broker had been used by the company as intermediary for delivery of policies, billing, collecting premiums and other policy matters. As such, defendant argues, this court should find, like the *Empire* court, that plaintiff is estopped to deny the apparent agency of its broker for purposes of notice.

In reply, plaintiff argues that neither *American Home* nor *Empire* is of any support to defendant because both cases stand only for the proposition that a prior course of dealing which includes the acceptance of notice of claims from an insured's broker may clothe the broker with apparent authority to accept subsequent notices of claims for the insurer. Plaintiff distinguishes *Mitchell* and *Goodman* as turning, respectively, upon an ambiguity placed in the policy at issue by the insurer and upon the insurer's naming of the insured's broker in the policy as its representative and thus authorized agent.

■ After reviewing the record in this case and the cases cited in support of each party's interpretation of that record, we are compelled to agree with plaintiff that there was no evidence of a

prior course of dealing between it, its agent, Guild Insurance Agency (Guild), Patis *and* the Burgoses as plaintiff's insureds such as would sustain the trial court's finding that plaintiff had clothed Patis with apparent agency authority to receive any of the notices required under the policy at issue.[2] That conclusion notwithstanding, however, we find the summary judgment for defendant and the denial of summary judgment to plaintiff sustainable on another ground appearing in the record.

■■ In addition to prior course of dealings between the parties, there is another exception to the general rule that a broker acts on behalf of an insured, and not on behalf of an insurer. That exception is custom.[3] (*Ledbetter v. Crudup* (1983), 114 Ill. App. 3d 401, 449 N.E.2d 265; see also 8 J.A. Appelman & J. Appelman, *Insurance Law & Practice* §4736, at 83-84 (1981), citing, *inter alia, Boston Store v. Hartford Accident & Indemnity Co.* (1922), 227 Ill. App. 192.) In regard thereto, the *Ledbetter* court stated:

> "Courts have found an insurance company can be estopped from denying the authority of a broker to act on its behalf where the broker had acted in accordance with customary practices. A custom or usage becomes binding upon parties if it has been uniformly acquiesced in and applied by the parties for such a period of time so as to indicate that the custom was contemplated by the parties at the time formation of the contract was undertaken. A custom or usage should be established by the testimony of several witnesses." *Ledbetter*, 114 Ill. App. 3d at 403.

■■ In addition, *DeGraw v. State Security Insurance Co.* (1976), 40 Ill. App. 3d 26, 351 N.E.2d 302, cited by the *Ledbetter* court, held that the insured's reasonable reliance upon his broker brought him within the scope of applicability of the custom and usage between an insurer, its agent and an insured's broker. *DeGraw* thus rejected a contention that such custom and usage was irrelevant to an action by the insured because he was ignorant of and thus could not have relied upon it. *DeGraw*, 40 Ill. App. 3d at 34.

---

[2]The fact that we disagree with plaintiff that *American Home* is a "prior dealings" case does not change this result.

[3]In arguing that there was prior course of dealing between plaintiff, Patis and the Burgoses, defendant cites evidence which relates more to customs followed by plaintiff and Patis than to a course of dealing involving each of them and the Burgoses. While that evidence is insufficient to sustain the summary judgment for defendant on a "course of dealings" theory, we find it sufficient to do so on a "customs" theory, as will be made clear below.

Applying the foregoing principles here, we find that, in view of the deposition testimony of Patis and plaintiff's claims manager, Michael Fitzgerald, plaintiff is estopped to deny Patis' authority to act on its behalf for purposes of receipt of notices from plaintiff's insureds. We so conclude by reason of Patis' adherence to the customary practice of receiving notices from plaintiff's insureds for forwarding either to plaintiff's agent, Guild, or plaintiff and by reason of plaintiff's acquiescence to that procedure. We further conclude that the testimony of Patis and Fitzgerald also supports the conclusion that that procedure was adhered to by the parties for such a period of time prior to the formation of the Burgoses' insurance contract that it was contemplated at that time.

Patis testified to the following at his deposition. He had placed approximately 100 to 200 risks with plaintiff through Guild. Guild, not he, would deal directly with plaintiff. With respect to the Burgoses' policy, he had collected the premiums from them and sent them to Guild. He sent them to Guild rather than plaintiff because that was the industry practice. With regard to policies placed with Guild, including the Burgoses' policy, Patis would receive all notices regarding cancellation, premium changes and renewals from Guild and then forward them to the insured. In addition, plaintiff would send policies issued to Patis' clients to Guild, which would send them to Patis for forwarding to the insured. With respect to the instant case, he had received the policy issued by plaintiff to the Burgoses from Guild for forwarding to the Burgoses. If Patis received notice of a claim from an insured, he would send it directly to plaintiff rather than Guild. That was Patis' own particular practice. In contrast, if Patis received notice of an "occurrence" from an insured, he would forward that notice to Guild. He would report an "occurrence" to Guild rather than plaintiff because an "occurrence" was not "a formal claim." However, Patis would have considered notice of an "occurrence" to Guild effective notice thereof to plaintiff because Guild was an agent of plaintiff.

Michael Fitzgerald, plaintiff's claims manager since December 1983, testified to the following at his deposition. Plaintiff received notice of occurrences from agents and brokers as well as insureds. Asked if he knew why the notice of claim with regard to defendant's suit against the Burgoses came from Patis rather than the Burgoses, Fitzgerald responded, "I can only speculate, but just on general procedure as is quite often, an insured will report the claim to the individual that the[y] pay their insurance premiums to. I don't know if that is the case here, but that would be my specula-

tion." Plaintiff's underwriting department would send the policies issued by plaintiff to its agent rather than directly to the insured. County Insurance Service, an insurance agency which had an agency relationship with plaintiff and for whom Fitzgerald worked from October 1980 to December 1983, would receive insurance policies from insurers. It would forward the policies to its brokers, if the policy was ordered from a broker, or directly to the insured if no broker was involved. While with County Insurance Service, Fitzgerald received notices of occurrences from brokers and insureds, although rarely because "[t]hat was not the normal course of a transaction for a claim." The "normal or regular" course was for the insured either to report directly to plaintiff or to their broker, who would then report it directly to the company.

The foregoing testimony of Patis and Fitzgerald amply reveals that plaintiff customarily used independent brokers who were not nominally its agents as an integral part of all phases of issuing and servicing its insurance policies. As such, we find that for purposes of receipt of notices of claims and occurrences from its insureds, Patis was an "authorized agent" of plaintiff, as that term was used in its policy, as well as an agent of his insureds for all matters relating to plaintiff's policies. In the former regard, we find most telling Fitzgerald's testimony that the "normal or regular" course was for insureds either to report claims and occurrences to *their* brokers, who would report them to plaintiff, *or* to report them directly to plaintiff. That is, it was just as normal or regular for insureds to report claims and occurrences to *their* brokers as it was for them to report them directly to plaintiff. Given that plaintiff, as a matter of custom, used these brokers to deliver policies to insureds, to collect premiums and to notify them of cancellations, premium changes and renewals, we believe that it manifestly authorized them to act on its behalf for purposes of receipt of the notices required under its policies.

Moreover, the record in this case amply reveals that the Burgoses reasonably relied upon Patis with respect to the giving of notice to plaintiff. As such, their ignorance of the customary practices of plaintiff, its agent, Guild, and independent brokers, including Patis, does not preclude them from availing themselves of the protections of those customary practices. *DeGraw*, 40 Ill. App. 3d 26, 351 N.E.2d 302.

Ramon Burgos testified to the following at his deposition. Asked if he had reported a threat by defendant to sue him, made at the time his son was being tried for the murder of Segarra, Burgos

testified, "Everything, I reported Mr. Patis." Asked whether he had reported anything about the shooting to plaintiff directly, Burgos testified, "No, sir. But Mr. Patis says he'd take care of that." Asked if he had received any letters from lawyers stating that they represented defendant and asking him to report "this" to his insurance company, Burgos testified that he had and that he gave most of the papers to Patis, who had stated, " 'I take care of it.' " Burgos gave Patis those letters because he thought there would be insurance coverage. Burgos called Patis the morning after Segarra's shooting to report it to him. He called Patis because he thought there would be some coverage for Segarra's shooting. The evening following Segarra's shooting, Patis went to see Burgos. At that time, Burgos told him everything that had happened the night before. Patis told Burgos, "Don't worry, I take care[ ]" and "we have insurance." Patis also told Burgos that he did not think Burgos was liable because the shooting happened outside the store. Asked if he ever specifically asked Patis if he had reported the shooting to Burgos' insurance company, Burgos responded, "Yes; because I believe if I report to him, I don't have to report to nobody else." When he was served after being sued by defendant, Burgos gave the papers to Patis because he believed there would be insurance coverage for the suit. Asked whether he understood that in its reservation of rights letter plaintiff was saying that it did not think it covered him for the lawsuit because he had not reported the shooting to it, Burgos responded, "Yes, but I did report it." When Patis explained the meaning of the letter to him, Burgos said to him, "[H]ow can they say this when I reported it to you[?]" Patis responded, "I know, you reported it to me. I know." Asked whether he ever specifically asked Patis if he had given the information about the shooting to the insurance company, Burgos responded that he asked him if he did what he had to and Patis said, "Yes, I know what to do."

When the foregoing testimony is coupled with the fact that Patis had been Burgos' insurance broker for 20 years, we believe that the reasonableness of plaintiff's reliance on Patis for the giving of notice to plaintiff is manifest.

Plaintiff notes that Burgos also testified that he knew that Patis was an insurance agent rather than an insurance company and that he knew the difference between the two. We find these admissions by Burgos insufficient to show that he also knew that giving notice of Segarra's shooting to Patis was not the same as giving notice to plaintiff.

Plaintiff also counsels against holding that Patis was its agent for purposes of receipt of notices from the Burgoses on the ground that we would be creating a *per se* rule that an insurance broker, such as Patis, who is normally the insured's agent, is always the insurer's agent for such purposes. However, we cannot agree that our decision in this case will have that effect.

■■ ■ The resolution of the existence of a principal-agent relationship depends upon the particular circumstances of each case. (See *Gasbarra v. St. James Hospital* (1979), 85 Ill. App. 3d 32, 406 N.E.2d 544.) Consistently with *Gasbarra*, our decision is based on the particular practices of *plaintiff* in using the brokers of its insureds as intermediaries between itself and its insureds in transacting business with them. Even more specifically, it is based on plaintiff's adherence to that customary practice by using *Patis* as an intermediary between itself and the Burgoses. Having used Patis as such an intermediary for practically all aspects of transacting business with the Burgoses, in conformance with that practice, plaintiff is estopped to deny his agency for the one aspect of transacting business which is at issue here. Only where it is shown that an insurer follows the same customary practices proved here in dealing with the broker-agents of its insureds generally *and* adhered thereto in dealing with the broker-agent of the insureds seeking coverage specifically need insurers fear the result reached in this case.

Finally, in view of our holding in this case, we need not address whether the Burgoses' failure to give plaintiff notice of Segarra's shooting is, alternatively, justifiable on the ground of a reasonable belief that plaintiff's policy did not cover that incident. Nor, in view of plaintiff's argument that prejudice to it is irrelevant to the issue in this case, need we consider or determine whether the conduct of the Burgoses or Patis prejudiced plaintiff.

For all of the foregoing reasons, we affirm the grant of summary judgment for defendant and the denial of summary judgment to plaintiff.

Affirmed.

CERDA, P.J., and RIZZI, J., concur.